815 So.2d 958 (2002)
John P. LAWSON, et al.
v.
Bridget WHITE, et vir.
No. 01-1173.
Court of Appeal of Louisiana, Third Circuit.
February 6, 2002.
Writ Denied May 3, 2002.
*959 Laurie Wilkinson Lyons, Walker, Tooke, Lyons & Jones, Shreveport, LA, Counsel for Plaintiffs/Appellants: John P. Lawson.
Charles Raymond Whitehead, Jr., Whitehead Law Offices, Natchitoches, LA, Counsel for Defendants/Appellees: John P. Lawson.
Thomas Taylor Townsend, Kelly, Townsend, & Thomas, Natchitoches, LA, Counsel for Defendants/Appellees: Bridget White.
Court composed of SYLVIA R. COOKS, BILLIE COLOMBARO WOODARD, and MICHAEL G. SULLIVAN, Judges.
WOODARD, Judge.
On October 10, 1995, Mr. John P. Lawson, his wife, Mrs. Marilyn Lawson, and Mutual Credit Plan, Inc., a loan company, filed a joint petition, styled "Suit of Damages for Fraudulent Actions" against Mrs. Bridget White, alleging that, as President and General Manager of Mutual Credit Plan, she had breached her fiduciary duty, resulting in Mr. Lawson, individually, losing $117,000, and Mutual Credit Plan, as the sole shareholder, an additional $316,900. Further, the Plaintiffs attributed Mutual Credit Plan's collapse to Mrs. White's alleged wrongdoing.
Mrs. White answered the petition. She denied any wrongdoing, intentional or otherwise, and any breaches of fiduciary duty. She asserted that Lawson suffered no loss and reconvened against him for damages for false arrest or malicious prosecution.
The trial court denied relief to, both, the original plaintiffs and the plaintiff-in-reconvention. It found that Mrs. White had not breached any duty to Mutual Benefit or to Mr. Lawson and that, neither, Mr. Lawson nor Mutual Benefit Plan suffered damages because of her actions. Mr. Lawson filed this appeal. We affirm.

* * * * *
The record indicates that, in 1976, Mr. Lawson established Tower Mortgage and Loan Company of Natchitoches (Tower Mortgage), a small loan company, and shortly thereafter, hired Mrs. White. Over the next several years, he trained her and she became highly skilled in the total operation of a consumer loan company. *960 He sold Tower Mortgage in July 1979. A short time later, Mrs. White, with Mr. Lawson's financial backing, organized Cane River Mortgage and Loan Company (Cane River), for which she served as President and General Manager. In 1980, she resigned to care for her newborn child. Subsequently, she returned to Cane River in 1983 or 1984 and resumed her position as General Manager. In 1986, Cane River was sold to Commercial Securities, for which Mrs. White went to work. Several weeks later, she told Mr. Lawson that she wanted to start a small loan company but had been unable to secure the funds from local banks. Thereafter, he agreed to invest $50,000 in the company in the form of debentures and $15,000 as a loan. She contributed an additional $10,000, because the State Banking Department required a total of $75,000 in capitalization.
On September 17, 1986, Mutual Credit Plan, Inc. opened its doors for business, She held the titles of President and General Manager. The extent and nature of her control and authority over the business remain in dispute, since Mr. Lawson acted in a supervisory capacity. In December 1994 or January 1995, he contacted Norwest Finance Company regarding selling Mutual Credit Plan's assets. Then, he contacted Mrs. White and requested that she prepare and send various financial statements, as well as delinquent accounts and collections reports concerning the preliminary negotiations to Norwest Finance Company for examination. At that time, she informed him that Mutual Credit Plan did not have any delinquent accounts that were 90 days past due. On January 28, 1995, Norwest Finance representatives visited the Mutual Credit Plan office and advised Lawson that they would return with auditors to perform a complete evaluation of the corporation's books, verify loan balances, and make sure that the notes or accounts receivable existed and performed well. After the audit, Norwest would make an offer to purchase the assets. The audit, however, never took place.
On March 3, 1995, Mrs. White called Mr. Lawson and asked that he drive to Mutual Credit Plan's office to discuss with him her actions during the previous four or five years. When he arrived, she informed him that he had "nothing to sell." She had a box of numbered ledger cards of accounts that she had not charged off from 1991-1994. He was unaware of their existence, and Mrs. White had no explanation. These cards, as well as several others later discovered in her desk drawer, represented $319,000 in accounts that had not been charged off. The accrued and uncollected interest on these accounts totaled $119,370. Notwithstanding, at the time of the trial, Mutual Credit Plan had successfully collected $44,331 in accrued interest and $229,000 in principle.

LAW AND DISCUSSION
This court will not set aside a trial judge's finding of fact, absent manifest error or unless it is clearly wrong.[1] In order for this court to find that the factfinder's determination warrants reversal, we must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong.[2] As long as the trial court's findings are reasonable in light of the record reviewed in its entirety, our court may not reverse, even if convinced that, had we *961 been sitting as the trier of fact, we would have weighed the evidence differently.[3]
Mrs. White asserts that, although her title was President, she merely worked as an employee, not an executive officer, and that she has conducted herself completely as Mr. Lawson had trained her since the commencement of her employ. For nearly twenty years, she alleges that it was his modus operandi to start-up a finance company, sell the business, and enter into a non-competition agreement, then, procure someone to "front" for him in the start-up of a new finance company and move all of the client base to that company. After the expiration of the non-competition clause, somehow, he would obtain the majority of the ownership and, ultimately, force out all of the other owners.
Several witnesses were deposed regarding her recollection of events. Ms. Helen Isgitt, an employee, testified that Mr. Lawson approached her about opening Mutual Credit Plan, Inc. She stated, "[h]e could no longer have stock in any company orI'm not exactly sure [sic] terms, but he could not have an association with another finance company because of the sale of Cane River Mortgage. So, Bridgett White and myself opened it for him." She further testified that at Mutual Credit Plan's inception, she purchased five percent of the stock. Mrs. White purchased the majority of the stock, but Mr. Lawson put up the majority of the money; however, over the course of the company's existence, Mr. Lawson and his family bought out the other shareholders. Ms. Isgitt indicated that Mr. Lawson frequently visited the office, had access to all of the books, and continuously instructed her and Mrs. White to whom he wanted to grant loans. Overall, Ms. Isgitt stated that he discussed the daily on-goings of the business and that he and Mrs. White, both, instructed her which debts to charge off during the year.
Mr. Robert Marquess, the company's CPA, stated in his deposition that Mr. and Mrs. Lawson provided him with the information necessary to keep the books; that Mr. Lawson informed him which debts should be charged off and in what amount; that at Mutual Credit Plan's inception, Mr. Lawson did not own any of the stock; however, by the time that the company was to be sold, the Lawson family were the sole shareholders.
From Mr. Marquess' and the other parties' testimonies, the court concluded that Mrs. White held a corporate office as a "front" to prevent Mr. Lawson from breaching a non-competition contract entered into when he sold a finance company that he had previously owned. After reviewing the record, we find no error in this conclusion of fact.
An appellate court may review a question of law to decide whether the trial court's decision is legally correct or incorrect.[4] If the trial court's decision was based on its erroneous application of law, rather than on a valid exercise of discretion, its decision is not entitled to a reviewing court's deference.[5] When an appellate court finds that a reversible error of law was made in the lower court, it must redetermine the facts, de novo, from the entire record and render a judgment on the merits.[6]
*962 Mr. Lawson alleges that the trial court committed, both, legal and manifest error by failing to apply the provisions of the Louisiana Corporation Code La.R.S. 12:91 and 12:95.
La.R.S. 12:91(A) provides in pertinent part:
Officers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders, and shall discharge the duties of their respective positions in good faith, and with that diligence, care, judgment, and skill which ordinary prudent men would exercise under similar circumstances in like positions[.]
Black's Law Dictionary defines a fiduciary as "a person having duty, created by his undertaking, to act primarily for another's benefit in matters connected with such undertaking. A term to refer to a person having duties involving good faith, trust, special confidence, and candor towards another." Mr. Lawson is correct that a fiduciary may not take advantage of her position for her personal benefit to the detriment of the corporation or its shareholder.[7] However, the evidence presented establishes that Mrs. White was not acting in a fiduciary capacity, because her titles as President and General Manager were simply a cover-up, permitting Mr. Lawson to breach the non-competition agreements entered into in each contract of sale.
After a review of the record, we find that the trial judge did not err in failing to apply La.R.S. 12:91 and 12:95, since Mrs. White was not a true officer of the corporation, but, only one in name and, thus, was not acting in a fiduciary capacity. Consequently, Mr. Lawson has failed to meet his burden of proof as La.R.S. 12:91(E) provides.
We do not find that the trial court's decision was manifestly erroneous. Accordingly, we find this argument is without merit.

DAMAGES
Mr. Lawson claims that he suffered $117,000 in damages, individually, and that Mutual Credit Plan suffered $318,500, in damages, because of Mrs. White's wrongdoing. However, since the trial court determined that she has no liability for any loss, this issue is moot.

CONCLUSION
Mrs. White bore the titles of President and General Manager of Mutual Credit Plan, Inc. in which Mr. Lawson was the sole stockholder. The trial court found that his allegations that he and Mutual Credit Plan suffered damages because of her breach of fiduciary duty were baseless.
Evidence revealed that Mr. Lawson clearly participated in the day to day operations of the corporation.
We cannot find that the lower court committed error. Accordingly, for the reasons stated, we affirm the trial court's judgment and assess all costs of this appeal to the Appellant, Mr. Lawson.
AFFIRMED.
NOTES
[1] Stobart v. State, Through D.O.T.D., 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989).
[2] Stobart, 617 So.2d 880; Mart v. Hill, 505 So.2d 1120 (La.1987).
[3] Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106 (La.1990).
[4] Jim Walter Homes, Inc. v. Jessen, 98-1685 (La.App. 3 Cir. 3/31/99); 732 So.2d 699.
[5] Kem Search, Inc. v. Sheffield, 434 So.2d 1067 (La.1983).
[6] Lasha v. Olin Corp., 625 So.2d 1002 (La. 1993).
[7] Spruiell v. Ludwig, 568 So.2d 133 (La.App. 5 Cir.1990), writ denied, 573 So.2d 1117 (La. 1991)